443 P.2d 482

Wm. M. HARRIS and Virginia M. Harris,
husband and wife, Plaintiffs-
Respondents,

v.

PRESTON–WHITNEY IRRIGATION COM-
PANY, a corporation, Defend-
ant-Appellant.

No. 10100.

Supreme Court of Idaho.

July 2, 1968.

Gee, Hargraves & Armstrong, Pocatello,
for appellant.

Merrill & Merrill, Pocatello, for respond-
ents.

McQUADE, Justice.

Owners of a home adjacent to an ir-
rigation canal brought this action against
the canal's owner, an irrigation company,
for damages allegedly caused by negligence
in permitting water to flow into the base-
ment of their home. The court found:
"water flowing in the basement was the
result of increased flow in the canal and
seepage through the banks into the base-
ment," and attributed the situation to the
"fault of" the canal owner. The court
awarded damages and granted an injunction

against maintaining the canal "so as to further flood Plaintiff's basement." Appeal from that judgment. We find no error in the court's award of damages and so affirm that part of the judgment. The injunction order, however, is too broad and as such is an abuse of discretion; it must be dissolved.

The following facts appear from the record. Respondents' home near Preston, Idaho, has a westerly boundary running immediately beside appellant's levee type (raised) irrigation canal. The canal was constructed in 1882 and in 1939 or 1940 had its last major overhaul. Respondents' home was substantially remodeled in 1955; a garage and new rooms were added and a basement made of concrete was built under the new parts of the home. The new basement rooms were a large bedroom, a den, a furnace room and a fruit room. The fruit room was the most westerly of the new basement rooms and its westerly wall (concrete) was common with the old house's underground portion that now is used as a root or potato cellar. This small cellar, about six by eight feet, had three dirt walls (the fourth was its easterly wall common with the fruit room) and a dirt floor. This root cellar was the underground part of the home that was closest to appellant's canal.

During several days beginning in late July or early August of the years 1962 to and including 1965, the court found, "water began flowing into the Harris [respondents'] basement from the west side of the house through the root cellar into the fruit room and into the rest of the basement as well as coming up through the cracks in the floor of the basement." Respondents themselves and several other witnesses testified the water kept coming in as they bailed it out. Its general level was from six to fourteen inches. In 1964 the basement water level was considerably lower than

in 1962 and 1963; in 1965 it was lower still. (Trial began March 14, 1966).

At no time since respondents had remodeled their home in 1955, the court found, was the canal structure chained (dredged and sediment collected) or its banks compacted ("sealing the ditch") in the area adjacent to respondents' boundary line, though these processes were used often in other parts of the canal. This neglect was because the garage did not leave sufficient maneuvering space for the customary operations. Apparently appellant did treat the canal with chemicals to destroy moss and other plants, but this treatment was applied uniformly throughout the canal, and so was applied in addition to chaining and compacting, not as a substitute.

In 1960, appellant built a dam (Foster Dam) and partially filled the resulting reservoir. By 1962 the reservoir was completely filled and more water than in previous years would run down the canal in the latter part of the season. So appellant's secretary testified, and the court so found.[1]

About a quarter mile downstream (southerly) from respondents' property, a check gate was in use until 1964 (from about 1950) to back-up water and assist diversion. During the late summer basement floodings of 1962 and 1963, the court found on undisputed testimony of several witnesses for respondents, the basement water would recede when the gates were removed.

In 1964 and 1965, coincidentally with the decreasing water level in respondents' basement, appellant did not use the check gate but instead used pumps. After this substitution, the canal water was kept at a lower level in the vicinity of respondents' property.

Each of several witnesses for respondents testified he had observed water seeping or oozing out of the canal's banks near respondents' home. Respondents dug a trench in their basement along the westerly edge of

---

1. "The Defendant constructed a dam and began filling a reservoir in 1960 and the reservoir was partially filled. In 1961 the reservoir was filled to about ⅔ capacity and filled to full capacity in 1962.

With this additional water there is a greater demand and therefor a greater volume of water delivered through the season. The ditch is used to peak flow for longer periods of time."

the fruit room and themselves observed water entering it, flowing from the west.

On appellant's case, a United States Bureau of Reclamation engineer testified the water table had been constantly rising (through 1965) in the area near respondents' home. In response to a hypothetical question which described the terrain surrounding respondents' property, the engineer testified there were four possible sources for the basement water and the most likely was deep percolation from nearby irrigation. However on cross examination he said he did not know how much irrigation water had been applied in the neighborhood at pertinent times. He also stated that if direct seepage from the canal's banks had been observed, such seepage could have only been canal water.

To further isolate the source of water flowing into respondents' basement, the court made the following findings. The general surface drainage of respondents' home and in the general area flows northeast to southwest. Because higher lands are located northeasterly of respondents' property, the sub-surface water also flows northeast to southwest. Therefore, it would be unnatural for drainage water to flow from west to east into respondents' basement.

However, the reclamation engineer testified surface or sub-surface drainage naturally flowing northeast to southwest would tend to go around the concrete walls of respondents' basement's northerly and easterly exteriors and flow into the basement through the dirt-walled root cellar, giving an appearance of a westerly-easterly flow.

As damages, respondents asked for and the court awarded $1,200.00. Respondents presented evidence which would support a finding of at least $800.00 property damage. There also was a permeating musty odor ("a bad smell") whenever the water was present and the basement, which had served until 1962 as a bedroom and living quarters for two sons of respondents, became unusable for living quarters after 1962. And respondents and other members of their family had to spend time bailing water from the basement.

With respect to the injunction, appellant's present president testified that in his estimation "in the past the canal has had excellent maintainance [sic]," and that in the future appellant would maintain it "exactly" as before, notwithstanding respondents' predicament.

■ Appellant, as a canal owner, is of course liable for any negligence in the maintenance of its canal which causes damages to others.[2] The district court's findings concerning appellant's negligence are supported by substantial evidence and so will not be disturbed.[3] Appellant contends the court failed to find specifically on the issue of negligence. The court found: appellant had failed to chain clean and to impact the canal banks alongside respondents' boundary; "water flowing in the basement was the result of increased flow in the canal and seeping through the banks into the basement"; and in its conclusions the court attributed damages to "the fault of" appellant. These statements adequately express a finding of negligence.

■ Appellant claims the $1,200.00 damage award is excessive, that at most the record would support an award for about $800.00. There is evidence from which the court could assess from $800.00 to $900.00 for property damage; besides this there was loss of use of the basement's former living quarters, the musty pervading odor and other inconveniences. We find no error in the award of damages.

2. I.C. § 42–1204 (canal owner must "carefully keep and maintain" canal); Casey v. Nampa and Meridian Irr. Dist., 85 Idaho 299, 379 P.2d 409 (1963); Albrethson v. Carey Valley Reservoir Co., 67 Idaho 529, 186 P.2d 853 (1947); McCarty v. Boise City Canal Co., 2 Idaho 245, 10 P. 623 (1886).

3. E. g., Casey v. Nampa and Meridian Irr. Dist., supra n. 2; Johnson v. Burley Irr. Dist., 78 Idaho 392, 304 P.2d 912 (1956).

■ Concerning the injunction, however, appellant's objection is well taken. The complete injunction order states: appellant "is hereby restrained and enjoined from operating and conducting its canal so as to further flood the Plaintiff's [sic] [respondents'] basement[.]" This order is not further clarified by the memorandum decision or by the findings and conclusions.

■ An injunction is statutorily defined as "a writ or order requiring a person to refrain from *a particular act.*"[4] Though the granting[5] or refusing[6] of an injunction is within the sound discretion of the district court, an injunction order must be addressed to "a particular act." We agree with ap-

pellant's contention that the order is vague and does not advise what particular acts appellant must refrain from. Appellant's normal canal operations are legitimate business, and unless they inherently injure others—which here does not appear to be the case—appellant should not be forced because of an imprecise injunction to carry on normal operations in constant danger of being found in contempt of court.

Judgment affirmed with respect to award of damages, reversed with respect to injunction. Action remanded for proceedings consistent with this opinion. No costs allowed.

SMITH, C. J., and TAYLOR, McFADDEN, and SPEAR, JJ., concur.

4. I.C. § 8–401 (emphasis supplied).

5. I.C. § 8–402; White v. Coeur d'Alene Big Creek Min. Co., 56 Idaho 282, 55 P.2d 720 (1936).

6. I.C. § 8–402; Milbert v. Carl Carbon, Inc., 89 Idaho 471, 406 P.2d 113 (1965).